STEM et al. v. HARMON et al.—113 S. W. (2d), 1203.

Middle Section. Nov. 27, 1937.

Petition for Certiorari denied by Supreme Court, March 5, 1938.

C. C. Jackson and Barton Dement, Jr., both of Murfreesboro, and W. B. Ferguson, of Nashville, for plaintiffs in error.

Manier & Crouch, of Nashville, for defendants in error.

FAW, P. J. Two separate actions for damages—one brought by Mrs. Mary Stem against O. L. Harmon and Nashville Linen Supply Company, a corporation, and the other brought by R. L. Stem, husband of said Mary Stem, against the same defendants—were tried together, by consent, in the circuit court of Davidson county, and at the close of all the evidence, the trial judge, on motion of the defendants, peremptorily directed the jury to return a verdict for each of the defendants, which was done, and a judgment was rendered and entered in each case dismissing the suit at the cost of the plaintiff.

A motion for a new trial on behalf of the plaintiff in each of the two cases was made and overruled, and thereupon each of the plaintiffs prayed, obtained, and perfected an appeal in the nature of a writ of error to this court. Pursuant to an agreement of the parties and an order of the trial court, the two cases have been brought to this court in one transcript, with a single bill of exceptions, and have been heard here on joint assignment of errors and briefs.

Although stated in different forms in five separately numbered assignments, the plaintiffs' assignments of error may be resolved into the proposition that the trial court erred in directing a verdict for the defendants in each of the two cases and in dismissing the plaintiffs' suits and taxing them with the costs.

No reason appears on the record, or is suggested by counsel, for holding that there was error in the judgment dismissing the actions and taxing plaintiffs with the costs, if there was no error in directing the verdicts for the defendants; hence the sole question for decision here is, whether the trial court erred in peremptorily directing the jury to return the verdicts for the defendants.

It appears, without dispute, that a truck owned by the defendant Nashville Linen Supply Company collided with the rear of a Whippett automobile owned by plaintiff R. L. Stem on the state highway connecting the towns of Murfreesboro and Shelbyville in

this state, between the hours of 10 and 11 o'clock at night on December 28, 1935; that defendant O. L. Harmon was an employee of defendant Nashville Linen Supply Company, and, as such, was driving the truck in the usual course and in the scope of such employment in the business of the codefendant at the time of the collision, and that, at that time, both of the plaintiffs were seated in the Whippett car and both sustained personal injuries as a result of the collision.

The extent and degree of the plaintiffs' injuries is a subject of debate on the briefs, but, as the verdicts for defendants were directed by the trial judge, we need not discuss the evidence with reference to the personal injuries suffered by the plaintiffs, further than to say that there is evidence that each of the plaintiffs suffered substantial personal injuries as a result of the collision.

Plaintiff Mrs. Mary Stem sued to recover damages for personal injuries to herself, and plaintiff R. L. Stem sued to recover damages for personal injuries to himself, and also to recover for the loss of services of his said wife and for his expenses paid and incurred as the result of her injuries.

In connection with the averments of plaintiffs' declarations (which, so far as deemed necessary, will be hereinafter stated), we have observed an obvious variance between the declarations and the proof, in that, it is averred in the declaration of each plaintiff that, "On December 28, 1935, plaintiff was traveling, as a guest, in an automobile belonging to one Steve Stem, and it was being driven at the time by said Steve Stem upon and over said highway in a Northerly direction, and on his right hand side or East side of the center of said highway, when said automobile became disabled and the said Steve Stem, the driver of said automobile, drove the two right wheels off of the concrete and onto the shoulder, leaving the two left wheels upon the concrete approximately two feet."

But the undisputed testimony of plaintiff R. L. Stem and of Steve Stem (a son of the plaintiffs) is that plaintiff R. L. Stem was the owner of the automobile which was struck by the truck as before stated; that, at the time the collision occurred, both plaintiffs were seated in said car owned by R. L. Stem, with plaintiff R. L. Stem at the steering wheel and plaintiff Mary Stem (with her daughter-in-law and two children) on the rear seat; and that said Steve Stem was not then in the Stem car, but was standing or walking in the rear of and a few feet from it.

However, the main proposition presented by the defendants' motion for peremptory instructions below was that, upon the undisputed evidence, the defendants were not guilty of any actionable negligence which was a proximate cause of the collision and of plaintiffs' injuries, or contributed thereto.

If the record supports the defendants' motion for peremptory in-

structions in the particular just stated, it is immaterial whether the plaintiffs, when injured, were guests in an automobile belonging to Steve Stem, as averred in their declarations, or were in an automobile belonging to plaintiff R. L. Stem as shown by the undisputed proof; and, in that aspect of the case, the variance would be immaterial. Tenn. Cent. Railway Co. v. Schutt, 2 Tenn. App., 514, 520. The "guest doctrine" is unimportant unless there is evidence that defendants were guilty of negligence as averred in plaintiffs' declarations, in which latter event it would be material to inquire whether or not the plaintiffs were guilty of contributory negligence.

The general direction of the Murfreesboro-Shelbyville State Highway is southward from Murfreesboro to Shelbyville. The collision in question occurred on this highway about 5 miles south of Murfreesboro. The home of plaintiff was about 4 miles east of the place of the collision, on or near a road running generally east and west, which intersected the Murfreesboro-Shelbyville Highway on the crest of a hill a short distance south of the point where the accident occurred, and from which "crest" there was a gradual decline of the highway both northward and southward. The plaintiffs had lived at, or in the vicinity of, their present home for twenty years or more, and were well acquainted with the highway at all points involved in this case.

Plaintiff R. L. Stem was fifty-one, and plaintiff Mary Stem forty-eight years of age at the time of the trial of this case in November, 1936. Their son (a witness) Steve Stem was twenty-eight years of age, and was married and lived with his wife (also a witness for plaintiff) on the same farm with plaintiffs, but in a different house and not as a member of their family.

In the afternoon of December 28, 1935, the plaintiffs, with Steve Stem and two small children of plaintiffs' (aged seven and eleven years, respectively), drove to the home of a son of plaintiffs, who lived on the Murfreesboro-Shelbyville Highway about 1½ miles north of the place where the collision subsequently occurred, for a holiday visit, and remained there until 10 o'clock, or a little later, that night, when they started for their homes in plaintiff R. L. Stem's Whippett car, with Steve Stem driving. Steve Stem's wife joined the party at the home of their host on this visit and was in plaintiff's car when the accident occurred. While plaintiff's car was going southward on the west side of the highway and was ascending the hill which terminated at the road intersection aforementioned, the motor "went dead," or "shorted out," and the car stopped. The driver (Steve Stem) ran his "battery down" trying to start the motor, but failed, and then got out of the car and pushed it while plaintiff R. L. Stem took his place at the steering wheel and guided the car. Finding it impossible for Steve to push the

car further up the hill, it was pushed by Steve and guided by plaintiff around to the opposite, or east, side of the highway and headed back northward and pushed down the hill in an effort to start the motor by the movement of the car with the clutch in.

According to the plaintiffs' evidence, the highway consisted of a concrete pavement 18 feet wide, and a graveled shoulder 4 or 5 feet wide on either side of the pavement. So far as appears, no measurements were made of any of the distances mentioned in the record, and the witnesses merely undertook to estimate the distances according to their respective recollections of the appearance.

The hill was not steep, and the car would not roll when in gear without being pushed. Steve Stem, walking behind the car, pushed it about 20 yards down the hill and stopped to rest, whereupon the car stopped with the two right wheels on the shoulder and the two left wheels on the concrete pavement—approximately one-half of the width of the car extending over the pavement.

The taillight on the Stem car was not "burning." It had "shorted out" when the car first stopped in ascending the hill. The front lights were "burning," but were very dim, as the battery was "run down."

While the Stem car was standing in the position and condition just described, with the plaintiffs and their two little children and Mrs. Steve Stem in the car and Steve Stem immediately behind the car, Steve Stem saw the lights of the defendants' truck approaching from the south as it came over the crest of the hill about 150 feet south of the Stem car, and he walked south about 10 feet and, with a view of obtaining assistance, attempted to signal the driver of the approaching truck to stop; but the truck, which was on its right side (or east side) of the pavement, did not stop until the instant the right front of the truck collided with the left rear of the Stem car. The truck stopped instantly, within a foot, when it struck the Stem car, but the impact moved the Stem car and it rolled down the hill about 100 feet and across the pavement and stopped on the west shoulder of the highway.

The weather conditions prevailing for several hours before and at the time of the collision are important in the determination of the issues.

Plaintiff R. L. Stem testified that it was a "pretty cold" night; that it had been sleeting and snowing and there was sleet or snow on the highway and the highway was "slick," that at the time of the collision there was a "mist of rain falling," and it was freezing on the windshield and windows of his car.

Steve Stem testified that "the roadway was covered with sleet that night," and was "slick;" that he supposed there had been "worse nights," but that he did not know that he "was ever out

on any worse night than that;" that it had "quit sleeting" when the collision occurred, but was "misting rain" at that time.

Plaintiff Mrs. Mary Stem testified that it was "sleeting and raining and trying to snow," and was an "awful night."

Defendant O. L. Harmon was thirty-two years of age at the time of the trial below, and had been employed as a truck driver by his codefendant, Nashville Linen Supply Company, for six years. He was returning from Shelbyville to his employer's place of business in Nashville, in the usual course of his employer's business, when the collision in question occurred. He testified that it was a "very bad night;" that it was "raining, snowing and sleeting" that night; that there was sleet on the highway and it was "very slick;" that the conditions were such that he was compelled to drive slow and that it took him "considerably more than an hour" to drive from Shelbyville to the scene of the collision—a distance of about 24 miles—and that he saw several cars or trucks "off the highway and in the ditches" along the way.

C. N. Trotter, thirty-one years of age, was riding in the truck with defendant Harmon from Shelbyville to Nashville. He lived in Shelbyville, where he was employed as a meat cutter by the Brothers Store. He testified (as a witness for defendant) that the highway was covered with ice and snow and it was "sleeting at the same time;" that the roadway was "slick, just like glass;" and that he saw "quite a few" cars in trouble along the side of the road "where they had slid out in the ditch and couldn't get back on the highway."

Mr. William J. Wade, a member of the Nashville Bar, testified (as a witness for defendants) that he drove in an automobile on the highway from Winchesster to Nashville (which included the Murfreesboro-Shelbyville Highway) on the night in question, passing the scene of the collision involved in this case about 9 o'clock; that it was the worst night for driving that he had ever seen; that in the afternoon it started raining and then turned "extremely cold;" that the road was caked with a sheet of ice, and when the rain turned into sleet and snow it covered the bottom cake of ice and made traveling "at its worst," because of the slick road and poor visibility; that between Winchester and Murfreesboro he saw "at least eight or ten cars or trucks off the highway;" that he was out on the pavement at times and it was "so slick he could hardly stand up;" that his car "stalled" two or three times, while going up a hill and he would "have to let his car roll back down the hill and get momentum to go over the hill."

Concerning the manner in which defendants' truck approached the scene of the accident and the circumstances attending the collision, we quote excerpts from the testimony of defendant Harmon as follows:

"Q. Now, at the place of this accident .or near it, is there a hill? A. Yes, sir.

"Q. A small hill? A. It is a long hill but not so very steep.

"Q. Now, in coming from Shelbyville towards Murfreesboro, did you or not first come up a long slope until you get to the crest of the hill? A. Yes, sir.

"Q. And then go over the crest of the hill and there is a long slope downwards towards Murfreesboro? A. Yes.

"Q. Now, at the time you drove up on the crest of this hill and started down, what speed were you making in your truck? A. I was making possibly fifteen miles an hour when I topped the rise.

"Q. Were you looking out ahead as you topped the rise? A. Yes, sir. You had to look very closely to stay on the highway that night.

"Q. Did you continue to look to see after you went over the crest of the hill? A. Yes, sir, continuously.

"Q. Now, how far was it from the crest of the hill down to where the Stem car was parked, about? A. I would say it was, oh, a good hundred and fifty feet or fifty yards, as nearly as I remember.

"Q. Were your lights burning on your truck that night? A. Yes, sir.

"Q. Was there or had there been any accumulation of sleet or snow on your headlights? A. There had been, yes, sir. I don't remember—but I had cleaned them off too during the night.

"Q. Well, did you or not have to stop and do that during the night as you came from Shelbyville towards Murfreesboro? A. Yes, sir, I did.

"Q. Now, after you got to the crest of the hill and started down, did your lights pick up this Stem car in front of you or any man? A. Not until I was right on him.

"Q. Well, how close? A. I would say twenty feet.

"Q. What did you see first? A. The man.

"Q. Now, where was he? A. He was in the path of my machine a little bit to the right of the center of the car, I think.

"Q. Standing in the highway? A. Standing in the highway or walking towards me in the highway.

"Q. And how close to the Stem car, about? A. Oh, I would say he was half the distance from the Stem car. He was possibly ten feet from the machine at the time I seen him.

"The Court: Q. When you first saw the car he was about twenty feet away from you? A. Yes.

"Q. And he was standing between you and the car? A. Yes, sir.

"Q. About half way? A. Yes, sir.

"Q. When you first saw him? A. Yes, sir.

"Q. And the first thing you saw was the man? A. Yes, sir.

"Mr. Crouch: Q. Now, at that time, what was the position of your truck or car on the roadway? A. I was on the right hand side of the highway.

"Q. Were you on the pavement? A. Yes, sir, I was on the pavement.

"Q. Wholly on the pavement? A. Yes, sir.

"Q. Now, about the time you saw the man—I believe you saw him first—how soon after that did you see the car, or was it about the same time? A. It was almost at the same time because they both came into my range of vision about the same time but I was conscious of seeing the man first.

"Q. Well, before the man actually came into your vision of your lights picked him up, were you or not looking ahead? A. Yes, sir.

"Q. As soon as you saw the man what did you do? A. Applied my brakes.

"Q. Then what happened? A. I just merely slid on into the machine ahead.

"Q. Your truck slid forward? A. Into the machine, yes, sir.

"Q. Into the Stem car? A. That is right.

"Q. What did the man do in the meantime? A. Jumped out of the way.

"Q. To your right or to your left? A. To my right.

"Q. Where was the Stem car on the roadway? A. Directly in my path.

"Q. Did it have any lights on it? A. Not in the rear. If any in the front there, they were very, very dim.

"Q. If there had been a red or yellow light on the back of this Stem car, would that or not have aided you in detecting it sooner? A. Yes, sir, it certainly would.

"Q. Were you expecting a car in front of you on the roadway at that time? A. No, sir.

"Q. I believe you say your car went straight ahead and slid into this car? A. Yes, sir.

"Q. How did you act at that time, quickly or otherwise? A. You mean at the time I seen the car?

"Q. At the time you saw the man and the car? A. I acted quickly. Applied my brakes instantly.

"Q. Well, why didn't you go to your left at that time, if you know? A. Well, the condition of the highway was such that if I had cut to the left I would have slid sideways into the automobile.

"Q. Well, did you think much or have time to think right at time? A. I didn't have time to think a great lot but I knew I was too close to that car to try to cut around, so all I could do was try to stop.

"Q. What part of your car came in contact with the Stem automobile? A. The bumper and headlight.

"Q. Which headlight? A. The right headlight.

"Q. Do you know about where the right headlight of your car contacted the Stem car? A. No, sir, I couldn't say exactly where it did hit it but hit it, I would imagine it must have been somewhere around the spare tire because in applying the brakes it throws your car off balance, especially on a slick highway, and you are going to slide, so it evidently must have hit near the center of the car.

"Q. Were your brakes in good condition? A. Yes, sir.

"Q. Was your right headlight broken? A. Yes, sir.

"Q. What happened to the Stem automobile following the impact? A. It rolled off down the highway, I would say, about thirty yards and came to rest on the left side of the highway.

"Q. Headed towards Murfreesboro? A. Yes, sir.

"Q. What kind of lick was it or impact when the cars came together? A. Well, it was slight but still enough to set the car in motion and roll it down the grade.

"Q. Where did you stop and when? A. Instantly. I don't think I moved even a foot after I hit the automobile.

"Q. Just repeat that. When and where did you stop after the impact? A. Instantly. I don't think I rolled a foot after I hit the automobile.

"Q. What was the first thing you did after you stopped? A. I tried to find out if I had hit the man in the highway.

"Q. Did you look after the man first? A. I looked for the man and then he came to the side of the truck and then we went down to the automobile to find out if any one was injured in the car.

"Q. Well, at that time was the highway slick? A. Yes, sir, very.

"Q. Any rain and sleet? A. Plenty of rain. I don't think it was sleeting right at that time. . . .

"Q. Now, was there another car passing there about the time of this accident? A. Yes, sir. Immediately this car came into my range of vision or about the time this car came into my range of vision, this other machine passed me.

"Q. Passed you on your left going towards Shelbyville? A. Yes, sir.

"Q. And did the other car have lights on it? A. Yes.

"Q. Well, when you came over the crest of the hill or before you got to the crest of the hill, did you notice that this other car was coming? A. No, sir.

"Q. When did you detect its presence or approach? A. Well, shortly after I topped the rise this other car came—the lights loomed up ahead of me.

"Q. Well now, that night at that time, could you or not see very far in front of you? A. No, sir, a very short distance. Driving that night was an awful strain.

"Q. And that was on account of the weather conditions? A. Yes, sir. . . .

"Q. What happened to your car as a result of the impact? A. It broke my right headlight and throwed the other light out.

"Q. Put your lights out? A. Yes, sir."

The entire cross-examination of defendant Harmon was as follows:

"Q. Mr. Harmon, I believe you say it was misting rain? A. No, sir, it was raining.

"Q. It wasn't raining hard, was it? A. Yes, sir.

"Q. Real hard? A. Yes, sir.

"Q. Now, you say you had cleaned off your headlights? A. And my windshield.

"Q. Now, how far back towards Shelbyville was it that you had stopped and cleaned off your windshield and headlights? A. That I can't say. I had only to clean them off one time after leaving Shelbyville.

"Q. Well, when you came over the top of the hill, they didn't need cleaning off then, did they? A. Not from snow and ice they didn't. It was water.

"Q. They were clear as you came over the top of the hill? A. With the exception of water.

"Q. You mean with the exception of a little rain? A. Water.

"Q. Water where? A. On the windshield and on the headlights.

"Q. Why didn't you stop and wipe them off then? A. I had a windshield wiper that was working but it was raining and the water stood on the windshield and you can't wipe it off:

"Q. Now, between where the accident happened and Shelbyville, it had gotten where you couldn't see good and you stopped and cleaned them off? A. Yes, sir.

"Q. Now, could you see good as you topped this hill? A. No, nor any other time.

"Q. Why didn't you stop and clean it off again then before you topped the hill? A. You can't clean rain off a windshield when it is raining continuously.

"Q. What did you clean off back towards Shelbyville? A. Snow and ice.

"Q. And you came over the top of the hill at about fifteen miles an hour? A. I would say that, in the neighborhood of that.

"Q. Did you increase your speed any down hill? A. No.

"Q. How far would these lights shine? A. That I couldn't say.

"Q. Well, you know the lights of your automobile even though

it was raining, would shine more than twenty feet, don't you? Now, don't you know that? A. I know they didn't.

"Q. You know they didn't? A. Yes.

"Q. You mean to tell me the lights you had on that truck at that time and it raining wouldn't give you light in front twenty feet ahead? A. That is right, it didn't.

"Q. Now, you don't mean to tell me with the condition of that road that you couldn't bring a truck to a standstill within twenty feet, do you—the condition of that road—do you mean to tell me that? A. No, sir. If I could I wouldn't have hit the automobile.

"Q. All right then, how come you to drive at such rate of speed you couldn't stop within the radius of your lights? How come you to do that? A. That I don't know. I was driving very carefully; I know that.

"Q. If you had been driving at five miles an hour probably you could have stopped within the radius of your lights? A. Yes, sir, possibly.

"Q. Now, you knew that at that time, didn't you? A. I suppose I did.

"Q. You knew that driving at fifteen miles an hour, taking into consideration the road, it being slippery, slick, and taking into consideration that your lights would only shine twenty feet, that if you should run up on an object you couldn't stop—you knew, that then, didn't you, and still you kept driving that way. Is that true? A. I was driving at right around the neighborhood of fifteen miles an hour.

"Q. And you don't know why you didn't slow down to where you could stop within the radius of your lights? A. No, sir. I considered I was driving at a safe speed.

"Q. Now, your lights were good. Is that right? That is, your lights, taking into consideration the weather? A. Yes, sir, I had good lights.

"Q. You say it was raining ordinarily hard? A. Yes, sir.

"Q. Now, do you mean to tell me that if the lights are good on a truck in an ordinary hard rain, you can't see over twenty feet? A. That is right. Possibly I could have seen further had it not been for the automobile I was meeting. The automobile forced me—

"Q. You had already passed this automobile coming before you struck this one, hadn't you? A. Before I struck it I had but at the time this automobile came into my range of vision this automobile was passing.

"Q. You mean, now, that when you were within twenty feet of the Stem car, automobile, this automobile which was meeting you passed you? A. Yes, sir, it had just gone by.

"Q. Now, the automobile that just passed you, that didn't blind

you did it? A. To some extent you are always conscious of a headlight that you are meeting when there is water on your windshield.

"Q. Did the automobile headlights that you were passing—A. Did it have headlights?

"Q. I don't know. Did it? A. Yes, sir.

"Q. I say did its lights, that is, the automobile's lights now, that you just passed, keep you from seeing further ahead than you could have seen if it hadn't been passing? A. To some extent it did, yes.

"Q. Then when you saw that automobile coming, knowing that to some extent it would blind you, how come you not to slow down? A. I was slowing down.

"Q. You slowed down on account of meeting this other automobile? A. Yes, sir.

"Q. Then you didn't slow down on account of Stem's car in front? A. I didn't see the Stem car. He had no lights.

"Q. Which caused you to hit the Stem car—you couldn't see it because you couldn't see over twenty feet by your lights or the other car's lights blinding you? A. The fact that he had no tail light. A red light is visible farther than just the blank back of an automobile.

"Q. Then as I understand you, the cause of your striking it was he had no tail light? A. That is it.

"Q. What kind of truck was it you were driving? A. One and half ton, G. M. C."

The defendant's witness Trotter, aforementioned, substantially corroborated defendant Harmon with respect to the manner in which Harmon was driving and the circumstances attending the collision.

The testimony of defendant Harmon hereinbefore quoted is not in conflict with any other testimony in the record, except that R. L. Stem and Steve Stem stated that it was "misting rain" at the time of the collision, and defendant Harmon stated that it was "raining real hard" at that time. For the purposes of the defendant's motion for peremptory instructions, we must assume that it was "misting rain," as stated by plaintiff, when the collision occurred; but whether it was "misting rain" or "raining real hard" at that time is, in our opinion, not a controlling fact, when considered in connection with the other undisputed proof which we have stated, in substance, herein.

In their declarations the two plaintiffs base their respective causes of action upon the same averments of negligence of the defendants as the direct and proximate cause of the accident and the injuries to the plaintiffs, which (in the declaration of Mrs. Mary Stem) are stated in three counts. In the first count it is averred that, "the defendant O. L. Harmon, the driver of said automobile

truck, negligently and carelessly failed to stop or turn his said automobile truck to his left so as to pass the automobile in which plaintiff was riding, he having plenty of room and space to do so, but instead negligently and carelessly ran his said automobile truck into, upon and against the rear of the automobile in which plaintiff was riding, thereby causing a heavy jar or impact, throwing plaintiff against the sides, back and other parts of the automobile in which she was riding, seriously and permanently injuring her'' (then follows averments with respect to plaintiff's injuries).

In the second count the averments of defendant's negligence are as follows: ''That said defendant O. L. Harmon violated section 2672 of the Official Code of the State of Tennessee, which section is as follows:

'' '*Vehicles Moving in Same Direction, How.*—When vehicles on said roads are traveling in the same direction, and the driver of the hindmost desires to pass the foremost, each driver shall give one-half the road, the foremost by turning to the right, and the hindmost to the left.'

''Plaintiff, therefore, avers that said defendant violated said statute in that, in his attempt to pass the automobile in which plaintiff was riding, or sitting, he failed to give said automobile, or plaintiff, one-half of said highway as provided by said statute, and on account of his failure to do so, he, the said defendant O. L. Harmon, unlawfully ran his said automobile truck upon, into and against the automobile in which plaintiff was riding, or sitting, thereby causing a heavy jar or impact, injuring plaintiff as set out in the first count hereof, which is here reiterated and adopted as fully as if copied herein, all without fault upon plaintiff's part, or the part of the driver of the automobile in which she was riding, or sitting, but all on account of the violation of said statute by said defendant O. L. Harmon, as aforesaid.''

And in the third count, the averments of negligence are as follows: ''That said defendant O. L. Harmon violated section 2681 of the Official Code of the State of Tennessee, which section is as follows:

'' '*Careless Driving.*—It shall be unlawful for any person to drive any vehicle upon a [road, street or] highway carelessly and heedlessly in willful or wanton disregard of the rights or safety of others or without due caution and circumspection at a speed and in a manner to endanger or be likely to endanger any person or property.'

''Plaintiff, therefore, avers that said defendant violated said statute in that he was not keeping a proper lookout ahead for other traffic, and/or did not have his car under control, and/or failed to slow down or stop his said automobile truck, and/or failed to turn to his left in order to pass the automobile in which plaintiff was riding, or sitting, he having plenty of room and space to do

so, but instead negligently and carelessly ran his said automobile truck upon, into and against the rear of the automobile in which plaintiff was riding, or sitting, thereby causing a heavy jar or impact, injuring plaintiff as set out in the first count hereof, which is here reiterated and adopted as fully as if copied herein, all without fault upon plaintiff's part, or the part of the driver of the automobile in which she was riding, or sitting, but all on account of the violation of said statute by said defendant O. L. Harmon, as aforesaid.''

With respect to the question of whether the defendants were or were not guilty of the negligence averred in their declarations, the contentions of the defendants are summed up in their brief as follows:

''The defendants contend, in these cases, that the driver Harmon, under admitted circumstances, as shown by the uncontroverted proof, was driving slowly, maintaining a constant look-out ahead and was in the exercise of ordinary care and that his failure to stop within the radius of his lights and avoid hitting the Stem car was not negligence, because Harmon's truck was passing, just after topping the crest of the hill, another automobile, going in the opposite direction, when his lights picked up the Stem car (and the man standing at its rear), parked on the roadway without lights and so close that a collision could not be avoided. The lights of the passing car and the absence of a tail light on the parked car, and poor visibility, due to rain, sleet, snow, and ice, prevented his seeing the Stem car sooner.

''The driver Harmon had no notice of any imminent danger ahead over the crest of the hill. He passed the car coming in the opposite direction, without either car stopping, making it necessary for each car to drive into a dark pocket. The lights of each car diminished the length of the radius of the lights of the other almost to the vanishing point, and especially so at the time, under the atmospheric conditions, making visibility very bad otherwise.

''The ordinary prudent person is not negligent in failing to stop under such admitted circumstances and he may reasonably expect others, like the Stems, who are in such a place of danger, to have regard for their own safety.''

It seems from the brief for plaintiffs in this court that the main contention of plaintiffs is that defendant Harmon was negligent because he ''was driving at such a rate of speed that he could not stop within the radius of his lights.'' There is no specific averment of such negligence in either of the declarations; but it may be that it is within the purview of section 2681 of the Code (hereinbefore quoted) on which a count of the declaration of each of the plaintiffs

618

is predicated; and we will so assume for the purposes of this opinion.

We find from the undisputed evidence that the collision in question was not caused by negligence on the part of defendant Harmon. We are of the opinion that, in view of the adverse conditions surrounding him, as hereinbefore pointed out, it could not be reasonably concluded that defendant Harmon was not exercising due care at the time the truck he was driving collided with plaintiffs' car. Without pausing here to review the cases, we think the action of the trial judge in directing verdicts for the defendants in the two cases now before us is supported by the principles enunciated in the cases of Main Street Transfer & Storage Co. v. Smith, 166 Tenn., 482, 63 S. W. (2d), 665, Huntsman Bros. Inc. v. Grocers Baking Co., 12 Tenn. App., 535, and Patterson v. Kirkpatrick, 11 Tenn. App., 162.

It results that the plaintiffs' assignments of error are overruled, and the judgments of the circuit court dismissing their actions at their costs are affirmed.

The costs of the appeal will be adjudged against the plaintiffs R. L. Stem and Mrs. Mary Stem.

Crownover and Felts, JJ., concur.